**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **WORLD OUTREACH CONFERENCE CENTER** | ) | |
| | ) | |
| Plaintiffs, | ) | **Case No. 06-2891** |
| | ) | |
| v. | ) | **Judge John H. Lefkow** |
| | ) | |
| **CITY OF CHICAGO,** | ) | |
| | ) | |
| Defendant. | ) | |

<u>**AMENDED MEMORANDUM OPINION AND ORDER**</u>

Plaintiff World Outreach Conference Center ("World Outreach"), an Illinois not-for-profit corporation, is a religious assembly or institution protected by the Religious Land Use and Institutionalized Persons Act of 2000 ("the Act"), 42 U.S.C. § 2000cc(a)(1). *See World Outreach Conference Ctr.* v. *City of Chicago*, 591 F.3d 531, 535 (7th Cir 2009). ("[E]ven the recreational and other nonreligious services provided at the community center are integral to World Outreach's religious mission[.]"). Plaintiff Pamela Blossom is World Outreach's senior pastor and registered agent. World Outreach currently owns the building located at 4 East 111th Street in Chicago, Illinois ("the building"). Constructed in 1926 by the YMCA,[1] the building was owned and operated as the Greater Roseland YMCA until the YMCA sold it in July 2005 to World Outreach. This dispute arises from roadblocks World Outreach encountered in obtaining authorization from the City of Chicago to use the building for a community center with a religious ministry.

---

[1] The exact YMCA corporate entity which owned the property is not of record, but it does not matter here.

World Outreach (including the Reverend Blossom) claims that the City violated the Act when, without a compelling governmental interest, it imposed a substantial burden on World Outreach's religious exercise and irrationally discriminated against it in violation of the equal protection clause of the Fourteenth Amendment.[2]  *See* 42 U.S.C. § 2000cc(a)(1).  World Outreach seeks damages and attorney's fees.  This court's jurisdiction rests on 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights), as well as 42 U.S.C. § 2000cc-2(a) (creating private right of action to assert violation of the Act). Venue is proper in this district under 28 U.S.C. § 1391(b) as the events at issue occurred within the Northern District of Illinois.  Cross motions for summary judgment are now before the court for decision.

## BACKGROUND[3]

For many decades, the YMCA operated a community center and single room housing facility ("SRO") at the building.  The building contained, in addition to meeting and recreational facilities in the basement and on the ground floor, 30 SROs on the second floor, 68 SROs on the

---

[2]  World Outreach also relies on the Illinois Religious Freedom Restoration Act, P.A. 90-846 § 15,775 Ill. Comp. Stat. 35/15.  The Seventh Circuit, ruling on an appeal from dismissal of the complaint, stated that the state law is, "so far as relates to this case, materially identical to section (a)(1) of the federal law, and so it need not be discussed separately." *World Outreach*, 591 F.3d at 533 (internal citations omitted). The court also pointed out that plaintiffs' claims under the First Amendment's free exercise clause, the equal protection clause for religious discrimination, and the Act are indistinguishable. *See id.* at 534-35 ("[W]e cannot see any point in a plaintiff's pitching a religious discrimination claim on *any* provision of the Constitution other than just on the statute.") (emphasis in original.) The court also affirmed dismissal of plaintiffs' religious discrimination claims. *Id. at* 538 "[T]here was no discrimination against World Outreach on religious grounds.").  The issues now pending before the court are the "substantial burden" claim under the Act and a class-of-one equal protection claim.

[3]  On a motion for summary judgment, the facts are to be stated in a light most favorable to the non-movant. *Naficy v. Ill. Dept. Of Human Servs.*, 697 F.3d 504, 509 (7th Cir. 2012).  Because cross motions are pending, the court will identify any questions of fact that are potentially material to the outcome.  Plaintiffs' statement of material facts, however, is rife with assertions that are not documented in exhibits or depositions.  Many facts rely on Blossom's understanding of the intentions of others or characterize rather than report facts.  These statements are thus inadmissible as are the numerous hearsay assertions.  Facts which are not submitted in compliance with Local Rule 56.1(b)(3) are disregarded.

third floor, and 68 SROs on the fourth floor. Each of the three SRO floors had a single bathroom. As of 2004, the YMCA's community participation and revenue had significantly declined. The YMCA commissioned an engineering/architectural study to assess its options for the building in light of declining community participation and revenue. According to the ensuing report, an estimated $10 million in repairs would have been required to upgrade the building to the YMCA's then-current program requirements.[4] Financial issues such as this led to the YMCA's decision to close the community center and sell the building. Demolition costs were estimated at $1 million. The appraised value of the land, as of 1999, was $500,000. The YMCA informed the City by letter dated May 31, 2005 that it would close.

Ninth Ward Alderman Anthony A. Beale had spoken publicly that he believed the YMCA should stay in the Roseland community. But once the decision to close was made, he supported two entities interested in purchasing the building: Chicago State University ("CSU") and Provider Realty Company, a developer. CSU wanted to use the building for a recreation facility. The developer wanted to use it for senior citizen housing. Both represented to Alderman Beale that they had funds to rehabilitate the building. Alderman Beale stated that he supported either of them because they planned to rehabilitate the building. Ultimately, CSU withdrew its interest in the property.

In May, 2005, Blossom on behalf of World Outreach presented to the YMCA a written proposal to purchase the building for "a multi-faceted ministry." World Outreach planned to include a GED placement and training center, a bookstore, office rental space, a performing arts

---

[4] The City had issued more than 100 code violation citations during the period May, 1986 to December, 2002.

3

center/school of music, a day care center, a Bible college, a communications center (for training

in advanced television/radio, communications production, and training for the hearing- and

visually-impaired community), a Christian night club, and a conference and educational center.

(*See generally* Pls. Ex. 3, Beale Dep.)

World Outreach had used space in the building once a week for approximately 15 months

before these negotiations began. Blossom had seen the basement and first floor (not the upper

floors with the SROs) before World Outreach made its first offer, and she knew the areas she had

seen were filthy, full of roaches and rats or mice, and had plaster falling from the walls. She had

been given a copy of the YMCA engineering report reflecting the need for a multi-million dollar

renovation. She discussed the report with a friend who handled insurance and the elders of

World Outreach, but she did not contact an architect, engineer, inspector, or other

knowledgeable professional to learn what was needed or what it would cost to repair the building

for her purposes. She made no effort to obtain financing for the rehabilitation project. Rather,

she planned to rely on volunteer skilled parishioners to make repairs.

During June, 2005, Blossom met with Alderman Beale about her desire to purchase the

building. In advance, she sent him a copy of World Outreach's proposal.[5] Alderman Beale

warned Blossom about the condition of the building and the anticipated cost of repairs,

suggesting that she lacked means to fund them. Blossom told Beale that she would "rely on the

Lord to give her the money." She refused to disclose to Beale any information about her

financial capability to accomplish her proposal. Alderman Beale testified that he would have

---

[5] Alderman Beale testified that at the meeting Blossom was not clear about her plans for the building, and he received the proposal after the meeting. A letter from Blossom to Alderman Beale dated June 8, 2005 suggests that Blossom is correct that he had the proposal before the meeting.

supported any buyer with capability to rehabilitate the building, including Blossom if she could do so. (*See* Pls. Ex. 3, Beale Dep. at 12-13.) Blossom believed Alderman Beale opposed it because he was angry at her and World Outreach for coming into the community without his approval (she hadn't "reached out to him."). Ultimately, however, the YMCA accepted World Outreach's offer of $380,000, and World Outreach took possession of the building on July 13, 2005.

On June 29, 2005, Alderman Beale submitted a zoning amendment to the City Council to "down zone" the use of the land from B3 Community Shopping District to M1 Limited Manufacturing/Business Park District. Beale said he normally proposes such amendments when it appears a building will become vacant. He chose the designation on the advice of a Zoning Department administrator because the building is located in a commercial area. On August 2, 2005, according to normal practice, Alderman Beale placed a hold on permit applications (including building permits) pending the zoning change. No building permit could be issued while the zoning amendment was pending. World Outreach proceeded to work in the building without a building permit.

Blossom believed that Alderman Beale had no reason to offer the zoning amendment or place holds on permit applications because the building would not be vacant where there were two outstanding offers to purchase it (presumably the other was Provider Realty), and Alderman Beale had no intention of withdrawing the holds after the amendment passed (implying that he was merely thwarting World Outreach's plans).[6]

---

[6] World Outreach has not offered evidence that holds continued past the effective date of the zoning amendment.

5

At the end of July, Alderman Beale directed the Department of Buildings to inspect the whole building. (*See* Pls. SOF Ex. 13, part 1, at C00095.) (Internal city memo indicating "the Alderman wanted a Tasc [*sic*] Force out there inspecting the whole building.")

A public hearing before the Zoning Committee of the City Council was held on September 27, 2005. Chairman William J.P. Banks stated his opinion that a special use permit would be needed to operate a community center in a B3 district. World Outreach's counsel argued that, because World Outreach was continuing the same use as the YMCA, it was a legal nonconforming use for which a special use permit was not needed. Alderman Bernard Stone stated that if World Outreach believed it was "grandfathered in" because it was continuing the same use as the YMCA, it had produced no evidence of it.[7] Blossom attended the hearing and spoke of her intention to create a business center on the second floor and apartments and condos on the third and fourth floors. She did not indicate a plan to operate an SRO. The Zoning Committee recommended to the City Council that the zoning amendment be adopted. (*See generally* Pls. Ex.13, part 1, Partial Transcript of Zoning Comm. Hearing.) The City Council passed the amendment on October 6 and it became effective November 1, 2005.

Although World Outreach did not include offering SRO accommodations in the proposal to the YMCA, although Blossom did not discuss that possibility with the YMCA or with Alderman Beale, and although in September, 2005 Blossom told a building inspector that she was not operating an SRO, Blossom testified at her deposition that she decided shortly after

---

[7] "A doctrine of Illinois law allows in some circumstances a land use to continue after a zoning change that would ban it, but only if the use was authorized by the zoning ordinance as it stood before the change." *Petra Presbyterian Church* v. *Vill. of Northbrook*, 489 F.3d 846, 848 (7th Cir. 2007) (citations omitted). *See* CHICAGO MUNI. CODE, § 17-1-1404 ("Any nonconformity under the previous Zoning Ordinance will also be a nonconformity under this Zoning Ordinance, as long as the situation that resulted in the nonconforming status under the previous regulation continues to exist.")

taking possession of the building that World Outreach would use the building for SRO housing. Blossom applied to the City for an SRO license on November 16 of that year.[8]

The storm known as Hurricane Katrina struck the Gulf Coast on August 29, 2005 causing the President to declare a national emergency. That triggered a series of actions by the State of Illinois and other states to respond. One response was the reception of thousands of evacuees from Louisiana to other communities. About a week after the storm, continuing for seven-to-ten days, the Federal Emergency Management Agency ("FEMA") flew evacuees to Chicago. Approximately 4,500 people arrived in Chicago and the collar counties.

The Illinois Department of Human Services ("IDHS") was in charge of Illinois' response for human services needs. Ronald Carter, Director of Strategic Planning for IDHS, led the effort, in conjunction with FEMA, the Illinois Emergency Management Agency, and other governmental agencies. IDHS worked with the Chicago Housing Authority, many non-governmental organizations such as Catholic Charities, the Heartland Institute, churches, and others to locate temporary housing and other needed services. This effort continued until approximately mid-October.

Carter's focus then turned to locating suitable permanent housing for evacuees. Under the United States Department of Housing and Urban Development ("HUD") rules, people had to be moved to permanent housing by the end of the year or early 2006. When a location was

---

[8] Blossom testified that World Outreach applied for a business license to operate a community center and SRO on August 3, 2005. Plaintiffs' citations to Exhibits 51-53 and 71 do not reflect an application for such a license dated August 3, 2005. The City correctly recites that the application of August 3 was for a limited business license to operate only the building's fitness center on a membership basis. (*See* Pls. Ex. 2e (Dkt. No. 193-4, page ID 2735).) Thus, the allegation on which the court of appeals relied in stating that the application was filed in August, 2005, 591 F.3d at 536, is not borne out by the evidence.

identified, Carter would assess whether the unit appeared to meet standards for section 8 housing

(a program administered by HUD). During October, 2005, Carter visited World Outreach's

facility with a view to finding permanent housing for approximately 50 single men who had been

in temporary quarters in the Tinley Park Mental Health Facility. To Carter, the building was not

yet, but could be made, ready to house these individuals. He liked that he could house a

significant number of people at one place, that the facility had the ability to feed large numbers

of people at one time, and that it had a recreational equipment on site.

The City sent inspectors to the building on five dates from August 19 to September 14,

2005. An August inspection revealed cracked plaster through all vacant rooms and stairwells,

defective fire escape panic hardware on the third and fourth floors, no notification of proposed

use for the 168 vacant SROs, stained and torn carpet on the second, third, and fourth floors, and

a missing handrail on the second floor south stairwell. On September 13 and 14, City inspectors

found an illegal religious assembly and community center without a special use permit, and,

among other problems, SRO rooms in disrepair.[9]

Timing was critical because the evacuees needed to be housed permanently as soon as

possible. For World Outreach, meeting the threshold requirements was daunting at best. World

Outreach, at a minimum, would need a certificate of occupancy for a licensed SRO, signifying

that all HUD section 8 habitability requirements were met. Multiple repairs and a series of

---

[9] World Outreach argues in its brief that by October 30 the problems were corrected. This assertion is without citation to the record and is therefore disregarded.

inspections would have been required to achieve this. Blossom began to repair SRO units after she was contacted about housing Katrina evacuees.[10]

About a month after his first visit, Carter returned and saw that about one-third of the units appeared ready for occupancy, although he knew nothing about the plumbing, electrical and structural condition of the building. On that visit, Blossom told him that Alderman Beale was opposed to having evacuees in Roseland and opposed to the building's being used for SROs. Blossom asked Carter to advocate for World Outreach with the Alderman. Carter may have spoken briefly to Beale, as Beale recalled an inquiry to which he responded that the building was not suitable to house people at that time.

During this period, Alderman Beale demanded from the YMCA information about closing community YMCA's in poor areas. He also wrote to the Department of Water saying that he was "not in support of the World Outreach Center," requesting that it deny a charitable exemption on its water bill. (Pls. SOF Ex. 49, ¶ 26.)

On December 3, Blossom wrote Carter that the renovation process was complete. Carter responded that an SRO license was still essential. Carter went to City Hall to learn whether it was likely that World Outreach could get an SRO license soon. On December 13, Carter reported back to Blossom that "after discussions with city officials it appears a follow up discussion with Alderman Beale is critical. It is my intent to reach out to him today." (Pls. SOF Ex. 6. (unmarked document within Exh. 1 to Carter dep.)

---

[10] In a letter to then-Mayor Richard M. Daley dated October 12, 2005, Blossom stated that World Outreach was in the process of painting and replacing carpet in the SRO rooms for evacuees. (Pls. SOF Ex. 39, p,3.)

On December 14, 2005, the City filed a lawsuit in the Circuit Court of Cook County seeking an injunction prohibiting World Outreach from using its property as a church and a community center without a special use permit as required for B3 zoning. On March 17, 2006, the City filed an amended complaint adding counts for operating a community center and a church in an M1 district. The City also alleged off-street parking zoning violations, improper signage and a public nuisance based on the alleged improper use and other ordinance violations. In response, World Outreach did not apply for a special use permit because it believed itself a legal nonconforming use.

On January 9, 2006, Carter wrote to Blossom that he would seek the assistance of State Senator James Meeks in reaching out to Alderman Beale, stating, "The need for 150 units for evacuees is as strong and necessary as ever." *Id.* On January 25, 2006, Carter received an email from Blossom saying she was still working on getting an SRO license. *Id.* By then, Carter had already concluded that the building was not a usable resource but assured Blossom that, if she got an SRO license, he would still be interested in referring evacuees to the building.

Even if World Outreach had obtained an SRO license and passed all required inspections, IDHS would not have moved anyone into the building but would have added it to a list of potential housing options for IDHS outreach workers to refer clients to.

Meanwhile, although IDHS had turned its attention elsewhere, Blossom and World Outreach continued to work on the building and made contacts with city officials about getting an SRO license. Inspectors from various City departments inspected the building for various reasons over this period. The earliest document indicating that an application for an SRO was prepared is dated February 2, 2007. (Pls. SOF Ex. 51.) (The document is not authenticated and

10

does not bear any stamps indicating that the City received it.) During the summer of 2006, World Outreach was working with the City to compile the architectural drawings and other materials necessary for the SRO license (Pls. SOF Ex. 2, Doss Dep. at 55), which meant that the application was not yet ready.

The City voluntarily dismissed the lawsuit without prejudice in April, 2006. The City has since admitted that a "church assembly" or "community center" use of the building would not have been subject to special use provisions of the zoning code while the parcel was zoned M1. (Def. Resp. To Pls.SOF at 9-10, ¶ 11.)

This federal litigation, filed May 24, 2006, led to the court's efforts to resolve the dispute. On January 19, 2007, the parties agreed that if World Outreach could prove to the Zoning Administrator that it had a legal nonconforming use and, if inspectors found the building to be in proper order, the building could be licensed as an SRO. World Outreach agreed to submit to the Zoning Administrator all the evidence that it believed proved continuous nonconforming use for the SRO.

On January 31, 2007, the Zoning Department signed off on World Outreach's SRO license application. Inspections and numerous repairs to the building had yet to be completed before the SRO license could issue. After necessary inspections were made and requirements met, the City granted World Outreach nonconforming status as a community center and SRO and an SRO license was issued on August 3, 2007.

World Outreach began providing SRO rooms 4 to 6 months thereafter. Currently, 30 to 32 units on the second floor and 35 to 40 units on the third floor are being rented at a rate of

$375 per unit per month.[11]  The City continued to find code violations as late as November 3, 2009 (broken plaster in corridors and rooms on the third and fourth floors, missing covers on electric junction boxes in the basement, a missing battery on a carbon monoxide detector in the boiler area, and other items).

## ANALYSIS

### I.      The Class of One Equal Protection Claim

"[A] deliberate, irrational discrimination, even if it is against one person (or other entity) rather than a group, is actionable under the equal protection clause."  *World Outreach Conference Ctr.*, 591 F.3d at 538, citing, *inter alia*, *Vill. of Willowbrook* v. *Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073 (2000) (per curiam).  "The paradigmatic 'class of one' case . . . is one in which a public official, with no conceivable basis for his action other than spite or some other improper motive (improper because unrelated to his public duties), comes down hard on a hapless private citizen." *Woodruff* v. *Mason*, 542 F.3d 545, 553 (7th Cir.2008)*, quoting *Lauth* v. *McCollum*, 424 F.3d 631, 633 (7th Cir. 2005).  To establish its "class of one" claim, World Outreach must show that "(1) it has intentionally been treated differently from other similarly situated facilities; and (2) there is no rational basis for the difference in treatment *or* the cause of the differential treatment is a 'totally illegitimate animus' " towards it.  *Woodruff*, 542 F.3d at 554, quoting *Maulding Dev., LLC* v. *City of Springfield, Illinois,* 453 F.3d 967, 970 (7th Cir. 2006) (emphasis added in *Woodruff*).

---

[11]  The City disputes this fact, stating that World Outreach's operation, on average, has never involved more than 36 to 37 SRO units.

The City argues that is entitled to summary judgment because World Outreach has not identified any other potential buyer of the building who had the Alderman's backing and was treated more favorably. By purchasing the building, it contends, World Outreach became dissimilar from others who did not purchase it, as any other purchaser would have had to apply and qualify for the same licenses and permits. Plaintiffs' theory of liability (based mostly on Blossom's opinion and hearsay confirming her opinion) seems to be that the City's demand that World Outreach obtain a special use permit, its rezoning the building into a manufacturing zone, its delay and obstruction of World Outreach's license requests, and its suing World Outreach all reflect that Alderman Beale vindictively tried to block World Outreach's efforts to obtain licenses because Blossom did not reach out to him. To whatever extent Blossom's evidence is admissible, however, it all goes to the second element of proof, the "totally illegitimate animus."

World Outreach's evidence of disparate treatment is lacking. There is no evidence that the other two potential buyers whom Alderman Beale favored had made campaign contributions or otherwise "supported" him. There is no evidence, other than Blossom's opinion, rebutting Alderman Beale's statement that he favored the other two candidates because they had funding to make needed repairs while World Outreach did not. Setting aside these two comparators, World Outreach has submitted no evidence of what "reaching out" to the Alderman means. If it means an implicit demand for a campaign contribution or an illicit *quid pro quo*, there is certainly no evidence of it, as even Blossom made no such assertion, nor does World Outreach have evidence that it occurred in a similar situation at another time. There is no evidence that, in a similar situation, Alderman Beale did not request rezoning and/or put a hold on licenses while the zoning amendment was pending. Without a comparator of any sort, World Outreach cannot

13

proceed to the second element of proof. Thus, no reasonable jury could conclude based on the admissible evidence that Alderman Beale was acting out of totally illegitimate animus against World Outreach unrelated to his public duties. The City is entitled to summary judgment on this claim.

## II.      The RLUIPA Claim

The Act "provides that a government land-use regulation 'that imposes a substantial burden on the religious exercise of a . . . religious assembly or institution' is unlawful 'unless the government demonstrates that imposition of the burden . . . is in furtherance of a compelling governmental interest; and it is the least restrictive means of furthering that compelling governmental interest.'" *World Outreach Conference Ctr.* v. *City of Chicago*, 591 F.3d at 533 quoting  42 U.S.C. § 2000cc(a)(1).  "[I]n the context of RLUIPA's broad definition of religious exercise, a land-use regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise– including the use of real property for the purpose thereof within the regulated jurisdiction generally–effectively impracticable."  *Civil Liberties for Urban Believers* v. *City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003) (hereafter "CLUB").  Substantial burden "mean[s] something different from [a] 'greater burden than imposed on secular institutions.'" *Sts. Constantine & Helen Greek Orthodox Church, Inc*. v. *City of New Berlin*, 396 F.3d 895, 900 (7th Cir. 2005).  "If a land-use decision . . . imposes a substantial burden on religious exercise (the statute defines 'religious exercise' to include the 'use, building, or conversion of real property for the purpose of religious exercise,' 42 U.S.C. § 2000cc-5(7)(B)), and the decision maker cannot justify it, the inference arises that hostility to religion, or more likely to a particular sect,

14

influenced the decision." *Id.* at 900. At the same time, a religious institution is not entitled to more favorable treatment than a secular institution. *Id.* "Unless the requirement of substantial burden is taken seriously, the difficulty of proving a compelling governmental interest will free religious organizations from zoning restrictions of any kind." *Petra Presbyterian Church*, 489 F.3d at 851.

Plaintiffs argue as follows: It is undisputed that during the period from 1999 to July, 2005, the YMCA operated a community center with 168 SRO units, which was at the time of sale a lawful nonconforming use; that World Outreach was entitled under the Zoning Ordinance to continue to operate a community center with 168 SROs as a nonconforming use; and that World Outreach started as early as June, 2005, to demonstrate its lawful nonconforming use, but the City did everything in its power to obstruct the effort. Therefore, the City has imposed a substantial burden on World Outreach in violation of the Act without a compelling governmental interest.

The City does not dispute that, during the period from 1999 to July, 2005, the YMCA operated a community center with168 SRO units as a lawful nonconforming use in a B3 district. The City argues that, even so, World Outreach's right to continue that use was not automatic; rather, World Outreach had to demonstrate to the City that its use of the building was the functional equivalent of the YMCA's use as long as the B3 classification applied. The City does not dispute that a special use permit was not needed for a community center or church in an M1 district but it does not concede that an SRO was permitted as of right in an M1 district. Principally, however, once the zoning issue was clarified, the delay was caused by World Outreach's failure to comply with the City's requirements for licenses and permits.

15

## CONCLUSIONS OF FACT AND LAW

The court reaches the following conclusions of fact and law based on uncontroverted evidence:

A.     **During the period from 1999 to July, 2005, the YMCA operated a community center with 168 SRO units, which was at the time of sale a lawful nonconforming use in a B3 district.**

B.     **Before the zoning amendment became effective on November 1, 2005, World Outreach was obligated to demonstrate that its intended use of the building was functionally similar to the YMCA's use**.

The Zoning Ordinance controls land use according to a rather complicated system of use classifications. "[It] broadly divides the city into R, B, C, and M zones for residential, business, commercial, and manufacturing uses, respectively. Each zone, in turn, is subdivided into numbered districts and subdistricts." *CLUB* v. *City of Chicago*, 342 F.3d at 755 (7th Cir. 2003). Community Center is a subcategory of Parks and Recreation. *See* MUNICIPAL CODE OF CHICAGO, ILLINOIS ("CODE") § 17-2-0207.[12] Religious Assembly is a separate category. Single Room Occupancy is a subcategory of Residential. *Id.* In a B3 district, a special use permit[13] is needed for an SRO, community center, and religious assembly. *Id.* § 17-3-0207. Operation of an SRO requires a business license, annual inspections and fees, and the landowner must meet all building code requirements applicable to a Residential A2 district multiple dwelling building.

---

[12]  Citations to CODE are found at American Legal Publishing Corporation's website: www.amlegal.com/library/il/chicago.shtml (last visited Apr. 1, 2013).

[13]  "Special Use approval is expressly conditioned upon the design, location, and operation of the proposed use consistent with the protection of public health, safety, and welfare, and the proposed use must not substantially injure the value of neighboring property." *CLUB*, 342 F.3d at 755-56, citing CODE § 11.10-4.

*See generally, id.* § 4-4-005. Thus, nonconforming use status was required to continue to operate a community center or SRO in the B3 district. The same was true for Religious Assembly, or church. As such, without a special use permit and SRO license, World Outreach could operate only as a nonconforming use in the B3 district.

**C.     During the period from July to November 1, 2005, World Outreach did not satisfy requirements to demonstrate a nonconforming use.**

"Nonconforming status runs with the land and is not affected by changes of tenancy, ownership, or management." *Id.* § 17-15-0106. But "[t]he burden of proving that a nonconformity exists rests with the subject landowner." *Id.* § 17-15-0104 (emphasis omitted). Although World Outreach insists on one hand that it did not have to get approval and, on the other, that it endeavored to prove its nonconforming use, the record contains no documentary submission to the Zoning Department dated after the City demanded a special use permit until the zoning amendment was adopted attempting to prove its nonconforming use. As it was World Outreach's burden to prove its nonconforming use, the only permissible inference is that World Outreach did not follow the Ordinance by presenting proof to the Zoning Committee or the Zoning Department. More importantly, during that period, World Outreach's proposed use of the building was not the same as that of the YMCA, as reflected in its proposal submitted to Alderman Beale and the Zoning Committee. Furthermore, during that period, World Outreach did not have, nor had it applied for, a license to operate an SRO. Therefore, any claim of "substantial burden" for this period of time is without merit.

**D.     After November 1, 2005, World Outreach was entitled in an M1 district to operate a community center and a religious assembly but not an SRO unless it had nonconforming status.**

After the zoning amendment was adopted, World Outreach appeared to be abandoning

17

the proposal it submitted to Alderman Beale and described to the Zoning Committee in favor of operating an SRO. Although the City has conceded that a special use permit was not needed for a community center or religious assembly in an M1 district, it has not conceded that an SRO is permitted. As indicated above, a community center is distinct from SRO. SRO is a subcategory under Residential Use and is not a residential use permitted as of right in an M1district. *See* CODE § 17-5-0204 ("Uses that are not listed in the table are . . . prohibited."); § 17-5-0207 (M-1 Table and Standards). Thus, the City was not imposing a substantial burden on World Outreach by continuing to demand compliance with the Zoning Code by establishing its status as a nonconforming use.[14]

The City does not seem to stand on the existence of a SRO in a M1 zone, however, but rests at least primarily on the evidence that the SRO units in the building did not meet Building Code standards for issuance of an occupancy permit.

---

[14] The court of appeals stated, "A community center is not a special use in a limited manufacturing district, which means that no Special Use Permit *could* be granted to permit the World Outreach center to operate." *World Outreach Conference Ctr.*, 591 F.3d at 536 (emphasis in original). It did not distinguish SRO from community center, presumably because it relied on the *allegation* that World Outreach was going to use the building in the same manner as the YMCA. *See id.* at 535 ("World Outreach wanted to operate the center just the way the YMCA had done for the previous 80 years[.]").

**E.      The City's conduct toward World Outreach in large part was directed towards enforcement of the Building Code and licensing requirements.**

There is record evidence that Alderman Beale injected himself into the City's dealings with World Outreach, even if the disputes of fact between Alderman Beale and Blossom about their conversations are set aside.  Alderman Beale explicitly did not support World Outreach, he called for a full-scale inspection after he learned that the building had been sold to World Outreach, and he tried to get the Water Department to deny World Outreach's charitable exemption. One can rather clearly infer that Beale was upset that his "aldermanic privilege" had been treaded upon (although he denied it).  But whatever Beale's attitude, World Outreach has not demonstrated that Beale took any action that was both unjustified *and* interfered with the ability of World Outreach to bring the building up to standards.  *See CLUB*, 342 F.3d at 761 (inherent political aspects of the Special Use, Map Amendment, and Planned Development approval processes are not a substantial burden).

As for the City, it filed the lawsuit in December 2005, which insofar as it contended that operating a "church assembly" and a  "community center" violated the Zoning Ordinance, was meritless.  As framed by the court of appeals' opinion, if, as pleaded, the City filed a frivolous (or malicious) lawsuit against World Outreach, it imposed a substantial burden on a religious organization.  The court of appeals likened World Outreach's allegations to a claim of malicious prosecution, or "harassment by frivolous legal claims."[15]  *World Outreach Conference Ctr.*, 591 F.3d at 537, citing *Reed* v. *Doctor's Assoc., Inc*.,  824 N.E. 2d 1198, 1205 (2005); 355 Ill. App. 3d 865, 291 Ill. Dec. 948, *Smart* v. *Bd. of Trus.*, 34 F.3d 432, 434 (7th Cir. 1994).

---

[15]  "That is an exact description of the conduct alleged in the complaint."  *World Outreach Conference Ctr.*, 591 F.3d at 537.

19

The evidence, however, does not support a finding of malicious prosecution. As stated in *Reed*,

> The elements of malicious prosecution are as follows: (1) the institution and prosecution of judicial proceedings by the defendant, (2) a lack of probable cause for those proceedings, (3) malice in instituting the proceedings, (4) a termination of the prior cause in the plaintiff's favor, and (5) suffering by the plaintiff of damage or injury from the prior proceeding.

*Reed*, 824 N.E.2d at 1205. The first, second, and fourth elements are satisfied by the evidence. World Outreach believes the City acted with malice.[16] But even if malice is assumed, World Outreach has suffered no damage or injury that would entitle it to relief for malicious prosecution. *Reed* recites "[t]he long-standing rule [] that without the arrest of a person or the seizure of a person's property or some other special injury, a cause of action for malicious prosecution will not lie. *Id*. At 1205, citing *Cult Awareness Network* v. *Church of Scientology, Intl.*, 685 N.E.2d 1347,1354; 177 Ill. 2d at 267, 226 Ill. Dec. 604 (Ill.1997); *Smith* v. *Mich. Buggy Co.,* 51 N.E. 569,175 Ill. 619 (Ill. 1898). In *Cult Awareness Network*, the Court reiterated that a plaintiff who claims malicious prosecution suffers no "special injury" where it is subjected to the ordinary trouble and expenses which arise from ordinary forms of legal controversy. 685 N.E.2d at 1354-55. By contrast, where the defendant refuses to accept an adverse judgment and continues to file lawsuits to harass the same opponent about the same issues, the plaintiff has suffered special injury. *Id*. at 1355.

---

[16] Presumably, if World Outreach could prove actual malice, it could prove substantial burden, but the court is persuaded that there is insufficient evidence of malice to go to a jury.
The City argues that the lawyers merely overlooked the recent zoning amendment when the complaint alleged improper use in a B3 zone. And the complaint and amended complaint contained other counts that may have been well grounded in fact and law even though abandoned. There is no documentary evidence supporting World Outreach's allegations of malice. Plaintiffs support their position with Blossom's opinion, hearsay statements, and innuendo based on Alderman Beale's hostility. Such "evidence" would be inadmissible at a trial.

Nonetheless, to the extent the meritless lawsuit caused World Outreach expense and delay, the inference of hostility to religion without justification could be drawn. This is similar to *Sts. Constantine and Helen Greek Orthodox Church*, where a city denied a church's application for rezoning in order to allow it to construct a church on a 14-acre parcel that it owned, and the church was willing to agree not to later sell the land for a nonreligious institutional use. The city had expressed no other concern about use of the land, but refused to allow the church to build. The court held that the city had imposed a "substantial burden" within the meaning of the Act. 396 F.3d at 901. Having to respond to a meritless lawsuit, as the court of appeals has already stated, is a substantial burden. *World Outreach Conference Ctr.*, 591 F.3d at 537-38 ("The burden imposed on a small religious organization catering to the poor was substantial (for burden is relative to the weakness of the burdened), and there was no possible justification for it."). The City has offered no justification other than its allegation that only two counts of the complaint were meritless. Still World Outreach had to respond and there is no evidence that the City would have filed solely because the signage at the site was improper.

Thus, the court concludes that there is no genuine issue of material fact that the City imposed a substantial burden on World Outreach by filing and maintaining the meritless lawsuit. Damages would be measured by the costs and attorney's fees actually paid by World Outreach and/or Blossom.

**F.      World Outreach was not entitled to operate an SRO until it met all requirements of the Building Code and obtained relevant licenses and permits**.

While World Outreach contends that the City, through its official departments and Alderman Beale, purposefully and maliciously obstructed and delayed the licensing process to prevent World Outreach from housing Katrina evacuees during the fall of 2005 to early 2006 and to prevent World Outreach from operating a community center in the building, the City contends that its conduct was solely to obtain compliance with the Zoning Ordinance and Building Code and to ensure the health and safety of citizens of Chicago who would use the building. *See* CODE § 17-1-050 ("This Zoning Ordinance is adopted for the purposes of . . . promoting the public health, safety and general welfare . . . ."). World Outreach lays out long paragraphs of facts from which it infers that the City's conduct was punitive rather than administrative.

The City contends that, because World Outreach failed to file applications for appropriate licenses and permits and to meet the City's requirements for those licenses and permits, World Outreach caused its own difficulty and delay. Although the City appears to concede that Blossom began early but unsuccessfully to get support from Alderman Beale and others, it disputes that the City did everything (or anything) in its power to obstruct World Outreach.

The material facts are those found in the chronology of events. In general, events fall into two categories, that of World Outreach's effort to house Katrina evacuees and that of general delay and difficulty in navigating the licensing and permit process before the pending lawsuit put the parties on a path to resolution of both the zoning and building code issues.

Habitability is without question a compelling governmental interest. Even where a nonconforming use is sought, the owner must demonstrate that the building is safe and in good repair. (*See* Pls. SOF Ex. 23.) Indeed, these rules apply to all landowners throughout the City of

22

Chicago. Plaintiffs do not take the position that World Outreach as a religious organization is exempt from compliance with building codes or that the codes impose a greater burden on World Outreach than is imposed on secular institutions. Indeed, World Outreach early on started to make repairs in order to make the building code-compliant.

### 1. Katrina Evacuees

Before the YMCA closed the building, the City had cited it for numerous code violations and for operating with an expired SRO license, among other things.[17] No knowledgeable witness, including Carter, considered the building habitable at that time. When Blossom met with the alderman in June, 2005, her proposal did not include a plan to use the building for SROs. Rather, she planned to use the building for a GED placement and training center, a bookstore, office rental space, a performing arts center/school of music, a day care center, a Bible college, a communications center (for training in advanced television/radio, communications production, and training for the hearing- and visually-impaired community), a Christian night club, and a conference and educational center. Despite these ambitious plans, for financing, she intended to rely on faith and volunteers in her church community to do repairs.

Nearly a month after the Katrina storm, when Blossom appeared before the Zoning Committee, she did not indicate a plan to operate an SRO in the building. Neither was there any mention of a desire to house Katrina evacuees. World Outreach did not apply to the City for a SRO license until mid-November of 2005. At no time during the fall of 2005 through the early

---

[17] World Outreach relies on the deposition testimony of Christopher Bielat, the YMCA corporate executive, for the statement that "[t]here were no building code violations anywhere in the building from 2000-2005." (Pls. SOF ¶ 5.) Mr. Bielat merely stated that he knew of none. (Pls. SOF Ex. 4, Bielat Dep. At 9:9-14.). The City has documented 35 citations issued from 2000 to 2003 in addition to the license violations (Defendant's Statement of Material Facts ¶ 15, dkt. #186, para. 15 and referenced exhibits). World Outreach's statement of fact is not supported by the evidence.

months of 2006, when housing for Katrina evacuees was critically needed, did the building meet section 8 habitability standards as was necessary to house evacuees either temporarily or permanently. Blossom stated to Carter in early December that the SRO units were ready but, even if true, the essential SRO license application had been filed but two weeks earlier. Although there is evidence that Beale was refusing to give his blessing to the project, Beale did not interfere with the repairs, and no reasonable jury would conclude that the SRO could have been licensed by early 2006. The City did not obstruct World Outreach with regard to Katrina evacuees. Rather, World Outreach did not have enough time and resources to come into compliance with building and licensing codes.

### 2. Licenses and Permits

As evidence of substantial burden, World Outreach also relies on Chairman Banks' assertion at the Zoning Committee hearing that a community center was not a proper use in a B3 district and that World Outreach would need a special use permit, Alderman Beale's statement in his deposition that a special use permit was needed to operate a church in a B3 district, and the City's position in its lawsuit that World Outreach had the burden to prove that its use of the property was a lawful nonconforming use even if they did not apply for a special use permit. All of these statements and positions are, in fact, correct, as set out above. Moreover, contrary to World Outreach's argument, downzoning to M1 *lightened* World Outreach's burden of proof, because M1 was a less restrictive zone than B3.

World Outreach was made to jump through a number of hoops to obtain City approvals, but there is no evidence that this burden was any different from any secular applicant's obligation. *See CLUB*, 342 F.3d at 761 ("[Scarcity of affordable land, costs, procedural

24

requirements, and inherent political aspects of the Special Use, Map Amendment, and Planned Development approval processes]–which are incidental to any high-density urban land use–do not amount to a substantial burden on religious exercise."). There is no dispute of material fact that by the time the federal lawsuit was filed World Outreach had not filed for all of the needed licenses and permits, and it had not performed the repairs to become licensed as an SRO, a recreational facility, or any other use for which it sought to qualify.

In summary, World Outreach has not demonstrated that the City's enforcement of the Zoning Ordinance and Building Code imposed a substantial burden that bears direct, primary, and fundamental responsibility for rendering religious exercise effectively impracticable. As in *Vision Church* v. *Village of Long Grove*, 468 F.3d 975, 998 (7th Cir. 2006), the City's land use requirements are "wholly neutral and apply generally to all property owners." World Outreach has not offered any evidence other than Blossom's mere assertion that, while permit and license applications were pending, World Outreach could not use the building for its ministry in any use for which it had complied with requirements but the City had denied the necessary license or permit. Although the licensing process took, as World Outreach claims, approximately two years, once World Outreach came into compliance, its activities, including religious exercise broadly defined, were not impaired, much less made effectively impracticable.

For these reasons, plaintiffs are entitled to recover their fees and expenses for responding to the meritless lawsuit but, otherwise, they are entitled to no relief under the Act and the City is entitled to summary judgment on all other claims.[18]

---

[18] The City is correct that the Illinois Tort Immunity Act, 745 ILL. COMP. STAT. 10/2-104, bars World Outreach's claim under the Illinois Religious Freedom Restoration Act.

25

**ORDER**

Plaintiff's motion for summary judgment (191) is granted in part and denied in part.

Defendant's motion for summary judgment (183) is granted in part and denied in part.

ENTER: June 10, 2013

Judge Joan Humphrey Lefkow
United States District Judge

.