**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WORLD OUTREACH CONFERENCE CENTER, an Illinois Not-For-Profit Corporation, and PAMELA BLOSSOM, President of WORLD OUTREACH CONFERENCE CENTER, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 06 C 2891 |
| v. | ) ) | Judge Joan H. Lefkow |
| CITY OF CHICAGO, | ) ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This case is before the court on the motion of World Outreach Conference Center's

attorneys for fees under 42 U.S.C. § 1988 and for costs under Federal Rule of Civil Procedure

54(d) (dkt. 359). On April 1, 2013, this court granted summary judgment in favor of World

Outreach and Pamela Blossom, its President,[1] in the amount of $15,000 on a portion of its claim

under the Religious Land Use and Institutionalized Person Act (RLUIPA), 42 U.S.C. § 2000bb *et

seq.*, and granted summary judgment in favor of the City of Chicago on all other aspects of the

RLUIPA claim and all other counts of the Amended Complaint. (Dkt. 247). The parties

stipulated to a final judgment order in the amount of $15,000, representing damages to World

Outreach on the successful claim, both parties reserving their appellate rights. (Dkt. 270.) On

appeal, the court affirmed the grant of summary judgment in favor of World Outreach but

remanded the remainder of the case for trial. On April 4, 2016, the case came to a close when

---

[1] There is no need to discuss the claims of World Outreach and those of its President separately. Accordingly, the court will refer to plaintiffs as World Outreach.

World Outreach accepted the City's Rule 68 offer of judgment for $25,001. For the reasons stated below, World Outreach is awarded $467,973.45 in attorney's fees, and the parties are directed to confer regarding costs as required under Local Rule 54.3.

## LEGAL STANDARD

Section 1988 provides district courts with discretion to award reasonable attorney's fees to the prevailing party in RLUIPA actions. 42 U.S.C. § 1988(b). While a party who receives even nominal damages is a prevailing party under § 1988, "a reasonable attorney's fee for a nominal victor is usually zero." *Aponte* v. *City of Chi.*, 728 F.3d 724, 726–27 (7th Cir. 2013) (citing *Farrar* v. *Hobby*, 506 U.S. 103, 115, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992)). If more than nominal damages have been awarded, courts follow the alternative path set forth in *Hensley* v. *Eckerhart*, which starts with determining the lodestar amount, *i.e.*, "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." 461 U.S. 424, 433, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983). The court may then adjust the lodestar amount upward or downward depending on a variety of factors, such as the degree of success, the novelty and difficulty of the issues, and awards in similar cases. *Id.* at 434, n.9 (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974)).

## ANALYSIS

The parties dispute whether a reasonable attorney's fee should be computed under *Farrar* or *Hensley*. *Farrar* applies if World Outreach obtained a nominal award, which is determined by whether "the plaintiff was aiming high and fell far short, in the process inflicting heavy costs on his opponent and wasting the time of the court, or whether . . . the case was simply a small claim and was tried accordingly." *Hyde* v. *Small*, 123 F.3d 583, 585 (7th Cir. 1997); *see also Aponte*,

728 F.3d at 728 (noting same). Although the vast majority of cases applying *Farrar* involve plaintiffs who were awarded $1 or $100—i.e., nominal, *de minimis*, or technical damages by any definition[2]—the Seventh Circuit has indicated that there is no precise dollar or percent of recovery threshold that triggers *Farrar*. Rather, a more holistic approach is used: "[I]n determining whether an award should be analyzed under *Farrar,* district courts should look at the entire litigation history, including the number of victorious versus unsuccessful claims, the amount of damages sought versus recovered, time expended by the parties, and judicial resources." *Aponte*, 728 F.3d at 728. In evaluating this case purely in light of *Aponte*'s language,[3] this would seem to be a case in which *Farrar* provides the appropriate methodology.

---

[2] Other cases, like *Cole* v. *Wodziak*, 169 F.3d 486 (7th Cir. 1999), which the City frequently cites, did not apply *Farrar* in the sense that the court determined that damages were nominal and therefore abandoned the lodestar approach. Rather, those cases discuss *Farrar* in the context of providing a justification for reducing the lodestar for things such as the plaintiff's degree of success.

[3] The complete quote from *Aponte* follows:

> Because of the apparent uncertainty about the meaning of the terms "nominal," "technical," or "de minimis" in the context of damages awards, we wish to add some further clarity. Justice O'Connor used the terms interchangeably in *Farrar,* and we cannot see how any of these terms differ. Whether we call an award nominal, technical, or de minimis, no specific dollar amount can be assigned to these kinds of trifling awards. Their meaning is contextual and will vary on a case-by-case basis. Our earlier decisions provide helpful guidance on determining whether a monetary award is, in fact, nominal or technical. *Hyde* instructs the district court, on the one hand, to apply *Farrar* if the plaintiff was "aiming high and fell short, [and] in the process inflict[ed] heavy costs on his opponent and wast[ed] the time of the court," and, on the other hand, to use *Hensley* if "the case was simply a small claim and was tried accordingly." *Hyde,* 123 F.3d at 585. So in determining whether an award should be analyzed under *Farrar,* district courts should look at the entire litigation history, including the number of victorious versus unsuccessful claims, the amount of damages sought versus recovered, time expended by the parties, and judicial resources.

728 F.3d at 728 (alterations in original).

World Outreach certainly aimed high and achieved meager monetary results, although it did achieve its goal of operating a community center despite the local alderman's opposition, which can partially be attributed to the litigation's ten-year war of attrition.

But despite *Aponte*'s broad language, the few cases to have considered whether *Farrar* applied where recovery exceeded the clearly nominal threshold have concluded that *Farrar* did not apply.[4] Although *Aponte* allows lower courts to apply *Farrar* in cases involving a few hundred or perhaps a thousand dollars, the Seventh Circuit continues to indicate that the lodestar is the appropriate methodology when damages are not objectively *de minimis*. In *Montanez* v. *Simon*, 755 F.3d 547 (7th Cir. 2014), the court ruled that a $2,000 recovery in a "simple civil-rights claim, overlitigated by both sides," was not so nominal so as to apply *Farrar*. *Id.* at 550, 556–57 ("We don't mean to suggest that [the plaintiff's] victory was purely nominal, in which case he would not be entitled to attorney's fees at all." (citing *Farrar*, 506 U.S. at 115)). Rather, such limited success warranted a substantial reduction of the lodestar, and the court affirmed the district court's substantial across-the-board reduction of the modified lodestar to account for the limited success. *Montanez*, 755 F.3d at 557. The same approach is warranted here. As such, the court will calculate the lodestar.

---

[4] For example, in *Bennett* v. *Slowiak*, No. 88 C 2018, 1994 WL 698488, at *2 (N.D. Ill. Dec. 12, 1994), the court found that a $10,000 "award was not merely nominal nor was it a 'technical' victory." Rather, the court declined to apply *Farrar* despite the plaintiff's initially seeking $6,000,000 in damages and reducing that request to $700,000 by the time of trial. Similarly, in *Cole*, 169 F.3d at 487–88, while the court noted that "[w]hen recover is low *enough* in relation to the demand . . . the judge may jettison the lodestar apparatus and choose an appropriate fee using other means," the court ultimately found that the $4,500d verdict following a $50,000 request was "more than a pittance" and affirmed the lower court's decision not to apply *Farrar*. Further, in *Estate of Enoch*, 570 F.3d 821, 823 (7th Cir. 2009), the court reversed the lower court, finding that obtaining $635,000 in damages after seeking $10,000,000 was "not merely nominal" so as to implicate *Farrar*.

## I.       Reasonableness of Hourly Rate

World Outreach bears the initial burden of demonstrating that the requested hourly rates for its attorneys are "in line with those prevailing in the community." *Pickett* v. *Sheridan Health Care Ctr.*, 664 F.3d 632, 640 (7th Cir. 2011) (quoting *Blum* v. *Stenson*, 465 U.S. 886, 895 n.11, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984)). If this burden is met, the City then has the burden to "offer evidence that sets forth 'a good reason why a lower rate is essential.'" *Id.* (quoting *People Who Care* v. *Rockford Bd. of Educ.*, 90 F.3d 1307, 1313 (7th Cir. 1996)). If World Outreach fails to satisfy its burden, the court may determine a reasonable rate. *See Uphoff* v. *Elegant Bath, Ltd.*, 176 F.3d 399, 409 (7th Cir. 1999).

For the most part World Outreach has met its burden of showing that its proposed rates are reasonable. The City argues that counsel seek a windfall and proposes significantly reduced rates. The court has considered the arguments raised and will address only those it considers substantial.

First, Daniel Dalton's declaration in support of World Outreach opining that certain of World Outreach's attorneys rates are reasonable have little value, "unlike affidavits describing what 'comparable attorneys charge for similar services.'" *Montanez*, 755 F.3d at 554 (quoting *Pickett*, 664 F.3d at 647). Similarly, Dalton's statement that a number of courts have found that $580 per hour is a reasonable fee for his services in RLUIPA litigation is not helpful since he fails to document it. That omission led the court to review the readily available RLUIPA cases in which Dalton has petitioned for fees. These cases suggest that Dalton, at least in some instances, received a much lower rate than he claims in his declaration. *See Church of Our Savior* v. *City of Jacksonville Beach*, 108 F. Supp. 3d 1259, 1273 (M.D. Fla. 2015) (finding $325 a reasonable

rate for Dalton); *Lighthouse Rescue Mission, Inc.* v. *City of Hattiesburg*, No. 12 C 184, 2014 WL 1653108, at *4 (S.D. Miss. Apr. 23, 2014) (finding $325 a reasonable rate for Dalton); *Paeth* v. *Worth Twp.*, 08 C 13926, 2010 WL 4867406, at *4 (E.D. Mich. Nov. 23, 2010) (finding $300 a reasonable rate for Dalton).

Second, the City argues that, to the extent that World Outreach's attorneys have a practice of discounting the rates they charge to clients so as to fulfill their charitable mission, the City too should benefit from that reduced rate. However laudable that practice, the relevant inquiry is not what a particular attorney charges but what is a reasonable rate in the community. *See Blum*, 465 U.S. at 895 ("'[R]easonable fees' under § 1988 are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel."); *see also People Who Care*, 90 F.3d at 1310 ("If the court is unable to determine the attorney's true billing rate, however (because he maintains a contingent fee or public interest practice, for example), then the court should look to the next best evidence–the rate charged by lawyers in the community of reasonably comparable skill, experience, and reputation." (quotation marks and citations omitted)). For this reason, the evidence of hourly fees of World Outreach's attorneys that the City has put into the record are of little value in establishing a reasonable hourly rate, as is the $125-200 per hour rate that the Alliance Defending Freedom (ADF) agreed to compensate World Outreach's attorneys as part of a non-recourse grant.

Third, just as the City tries to inject inapplicable hourly rates into the analysis, so does World Outreach. The fact that one of World Outreach's attorneys was able to recently obtain a $750 hourly rate is of little value given that the matter was the representation of a limited

partnership in its sale of a hotel in Memphis, Tennessee. That representation is not indicative of a reasonable rate in the relevant community.

Fourth, the City cites case law that this court may veer from previous fee awards if it has justification, but the City has not provided any reason why the fee awards in RLUIPA cases obtained by World Outreach's counsel should not be followed here.

Based on all the submissions and arguments, the court concludes that the fee awards referenced by World Outreach are most relevant, particularly the two RLUIPA awards it frequently cites: *Power of Praise Worship Ctr. Church* v. *Vill. of Dixmoor*, No. 10 C 5436, 2011 WL 1157550 (N.D. Ill. Mar. 29, 2011), and *The King's Tabernacle* v. *Town of Johnson*, No. 16 C 30 (D.R.I Mar. 30, 2016).

### 1. John W. Mauck

A reasonable rate for Mr. Mauck is $600 per hour. In *Power of Praise*, Mauck's rate was set at $550 in 2011, and in *The King's Tabernacle*, $600 in 2016. These rates are reasonable, as is the $50 increase in the later award.

The City argues that a reasonable hourly rate for Mauck is $450, which appears to be primarily based on the Legal Services Agreement entered into for this case between World Outreach and its attorneys. The Legal Services Agreement, entered into in 2006, does not account for the delay in payment, however. *See Pickett* v. *Sheridan Health Care Ctr.*, 813 F.3d 640, 647 (7th Cir. 2016) ("Since payment for services in civil rights litigation often comes by court order years after the services were performed, the court must account for the delay in payment of attorney's fees. To account for delay, a district court … may calculate the fee award for services rendered in prior years using the attorney's current hourly billing rate. Or it may

calculate the fee award using the hourly rate the lawyer charged at the time the lawyer performed the services for the client (the 'historical rate') and add interest to that amount." (citations omitted)).

Six hundred dollars per hour is a $150 increase over ten years, which is reasonable. Although higher than fee awards in other RLUIPA cases, Mauck's services have recently been valued at that level. Further, many of these other RLUIPA fee awards were issued in less expensive legal markets than Chicago. The evidence of fee awards in RLUIPA cases from more expensive—and, thus, more comparable to Chicago—legal markets suggests that Mauck's rate is reasonable. *See, e.g.*, *Congregation Rabbinical Coll. of Tartikov, Inc.* v. *Vill. of Pomona*, No. 07 C 6304, 2016 WL 3030253, at *3–4 (S.D.N.Y. May 25, 2016) (accepting the plaintiff's requested blended hourly rate of $375 as reasonable, but finding that the rate falls below the reasonable rate generally received for complex litigation in the Southern District of New York and significantly below the $700 per hour that the defendant's RLUIPA counsel was charging its client).

### 2. Andy Norman

A reasonable rate for Mr. Norman is $550 per hour. World Outreach provided sufficient support for this rate based on the past fee awards cited in Norman's declaration. The City counters that such a rate cannot be supported because Norman regularly charges paying clients substantially less. The argument does not recognize the distinction noted above between what nonprofit counsel may charge a client and what is a reasonable market rate for services. The argument also does not take into account that the other cases the City cites were not as complicated as this one.

### 3. Noel W. Sterett

A reasonable rate for Mr. Sterett is $400. His declaration demonstrates significant RLUIPA litigation experience. Additionally, Sterett's services were recently valued in *The King's Tabernacle* at $400 per hour. While Sterett believes he is entitled to an additional $25 in this case, he does not provide any support for this increase. Further, in 2011, Sterett's services were valued at $300 in *Power of Praise*. The $100 jump in that rate from 2011 to the present is commensurate with Sterett's increased experience, which was on display in the case. While the City proposes a rate of $225 per hour, that rate is inconsistent with Sterett's expertise and the rate of similarly skilled RLUIPA attorneys.

### 4. Richard C. Baker, Richard S. Bell, J. Lee McCoy, Jr., Amy J. Parrish

Reasonable rates for Mr. Baker, Mr. Bell, Mr. McCoy, and Ms. Parrish are $500, $400, $300, and $300, respectively. These rates reflect World Outreach's proposal for Baker and Bell—which are supported by their experience and are consistent with the fee awards that Mauck, Norman, and Sterett have been granted in other RLUIPA cases—but are $50[5] less than World Outreach's proposed rates for McCoy and Parrish.[6] The proposed rates for McCoy and Parrish are inconsistent with a reasonable current rate for the type of work that they actually performed in this case.

From Norman's declaration it appears that McCoy did not begin to work on RLUIPA

---

[5] In certain parts of its briefing, World Outreach appears to argue that McCoy's time should be compensated at $425 per hour. (*See, e.g.*, dkt. 375 at 18.) This is likely an error, as each time World Outreach summarized its fee request it included a $350 hourly rate. (*See, e.g,*, *id.* at 27.) In any event, as noted above, $300 per hour is a reasonable rate for McCoy.

[6] The City proposed that reasonable hourly rates for Baker, Bell, McCoy, and Parrish are $320, $250, $125, and $125. It did so with little explanation as to how it arrived at such rates, other than trying to tie McCoy's rate to the ADF grant, an argument that has been rejected above. These rates are significantly below the prevailing rates in a legal market like Chicago, and are not reasonable.

cases until he joined Mauck & Baker, which coincided with the beginning of this case. Given the enormous number of hours that McCoy spent on this litigation (in excess of 2,000), it appears that he was a novice at the time, as the City points out in their specific objections to the type of work he performed. Given the work performed, the $300 rate that was established in *Power of Praise* in 2011, remains an adequate rate here. The same is true of Parrish. In *Power of Praise*, her services too were valued at $300 per hour, and World Outreach has provided no information that would justify a higher fee in this case based on the type of work that she performed here.

**B.**     **Paralegals**[7]

Consistent with the trend in this district, which the court will not buck, paralegal time will be compensated at a rate of $125 per hour. *See, e.g.*, *Koncor* v. *Esser, James & Assocs., LLC*, No. 16 C 5574, 2016 WL 6822666, at *2 (N.D. Ill. Nov. 18, 2016) (valuing paralegal time at $125 per hour); *Washington* v. *Office of the State Appellate Defender*, No. 12 C 8533, 2016 WL 5233563, at *7 (N.D. Ill. Sept. 22, 2016) (valuing paralegal time at $100 per hour); *In re Sears, Roebuck & Co. Front-loading Washer Products Liability Litig.*, Nos. 06 C 7023, 07 C 0412, 08 C 1832, 2016 WL 4765679, at *18 (valuing paralegal time at $125 per hour and finding that the Consumer Law Report found the average paralegal rate in Chicago to be $127 per hour).

**II.     Reasonableness of the Number of Hours Expended**

What qualifies as a "reasonable" use of a lawyer's time "is a highly contextual and fact-specific enterprise." *Sottoriva* v. *Claps*, 617 F.3d 971, 975 (7th Cir. 2010). As such, the court has

---

[7] In addition to paralegal time, World Outreach also requests fees for its communications manager for public relations work. As discussed below, since fees for such work are not compensable, the court need not determine what a reasonable rate for such work would be. Additionally, World Outreach is no longer seeking fees for Sorin Leahu.

"wide latitude" in awarding attorney's fees. *Id.* (internal quotation marks omitted). The court considers whether hours are "excessive, redundant, or otherwise unnecessary" and may reduce the lodestar calculation, for example, for hours spent on unrelated and unsuccessful claims, hours attorneys would not bill to their clients, and hours for which the prevailing party has failed to provide adequate support. *Hensley*, 461 U.S. at 433–34. Because of its familiarity with the litigation, the court is in the best position to determine the number of hours reasonably expended in the litigation. *See McNabola* v. *Chi. Transit Auth.*, 10 F.3d 501, 519 (7th Cir. 1993).

The City first argues that hours spent on unsuccessful claims should be eliminated from the lodestar. Second, it points to specific categories of fees that are non-compensable under § 1988 and the terms of the offer of judgment. Third, it points to a number of billing entries that reflect excessive work, work that would not ordinarily be billed to clients, or work that should have been delegated to lower-billing personnel.

### A.      Unsuccessful Claims

In general, a prevailing party is only entitled to recover for the hours devoted to the claim on which it prevailed. *See Richardson* v. *City of Chi.*, 740 F.3d 1099, 1103 (7th Cir. 2014) ("If an attorney's billing records permit the calculation of the hours devoted to the claims on which the plaintiff prevailed, then all a judge need do is determine the market rate for an hour of the lawyer's time and whether the fee generated by multiplying the hours by the rate is reasonable in relation to the value of the case (which can include precedential value as well as the plaintiff's monetary recovery)." (citing *Hensley*, 461 U.S. at 440)). As with every rule, there are exceptions: "Courts are to differentiate 'winning and losing claims [that] are just different legal theories in support of the same relief' from 'losing claims seeking different or additional relief, or damages

against different defendants.'" *United States* v. *All Funds on Deposit with R.J. O'Brien & Assocs.*, No. 11 C 4175, 2014 WL 1876139, at *3 (N.D. Ill. May 9, 2014) (alteration in original) (quoting *Richardson*, 740 F.3d at 1103); *see also Hensley*, 461 U.S. at 435 ("In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.").

World Outreach brought nine claims for relief in its amended complaint. (*See* dkt. 63.) Counts I–V and VII alleged violations of the first amendment and equal protection clauses of the Constitution or related federal (RLUIPA) or state laws (Illinois's Religious Freedom Restoration Act) because the City treated World Outreach differently from others or otherwise burdened its religious exercise. These claims merely present different legal theories in support of the same relief based on the same conduct.[8]

The other counts are different. They are based on sufficiently distinct facts and legal theories that they "cannot be deemed to have been expended in pursuit of the ultimate result achieved." *Hensley*, 461 U.S. at 435 (quotation marks omitted); *see also id.* ("The congressional

---

[8] In discussing World Outreach's claims in the first appeal in this case, although the Seventh Circuit discussed the redundancy of these claims, it seems to have recognized their relatedness: "The Illinois law, 775 ILCS 35/15, is, so far as relates to this case, materially identical to section (a)(1) of the federal law, and so it need not be discussed separately . . . . [S]ince discrimination against or in favor of a religious organization on religious grounds is expressly prohibited by section 2000cc(b) of RLUIPA, quoted earlier, we cannot see any point in a plaintiff's pitching a religious discrimination claim on *any* provision of the Constitution, rather than just on the statute." *World Outreach Conference Ctr.* v. *City of Chi.*, 591 F.3d 531, 533, 534–35 (7th Cir. 2009) (*World Outreach II*) (citations omitted).

intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.").

Count VI alleged that the City violated its own zoning ordinance. As a result of the Illinois Tort Immunity Act, such a claim cannot give rise to damages. Counts VIII and IX alleged violations of Illinois Supreme Court Rule 137 and Federal Rule of Civil Procedure 11. The Seventh Circuit affirmed the dismissal of these counts:

> We also do not think that World Outreach had any basis for seeking damages under Illinois Supreme Court Rule 137, which is materially the same as Rule 11 of the federal civil rules, as a sanction for frivolous motions in the state-court case that was dismissed, not in the present case; and Rule 11 does not authorize a judge to impose sanctions in a case in another court unless the case merely originated there and was removed to his court . . . . World Outreach also seeks sanctions under Rule 11 for the motion to dismiss that the City filed in the present case, but although the motion was weak it was not frivolous or otherwise sanctionable, or so at least the district judge could (and did) conclude without abusing his discretion.

*World Outreach Conference Ctr.* v. *City of Chi.*, 591 F.3d 531, 538 (7th Cir. 2009) (*World Outreach II*). These sanctions claims are unrelated to and seek relief independent of the claims on which World Outreach prevailed. Accordingly, the 90.3 hours devoted to these counts will be excluded from the lodestar.[9]

## B.      Non-Compensable Categories of Fees

The City argues that World Outreach is seeking fees that are non-compensable under § 1988 or the terms of the offer of judgment. World Outreach does not take issue with the City's categorization of World Outreach's time entries but, instead, argues that it is entitled

---

[9] Tables detailing these hours and the other hours deducted from the lodestar are included at the end of this section.

categorically to its fees. Many of World Outreach's arguments are cursory, offering little explanation as to why it believes that it can recover for work that appears to be extracurricular in many respects.

### 1. Miscellaneous Work

The City has identified a number of entries that it argues are not related to this litigation. The court has reviewed these entries, and it appears that in many respects World Outreach's attorneys were functioning in a general counsel role for World Outreach but did not separately track their time for activities not related to this litigation. World Outreach offers little in the way of an explanation for its time entries, only stating, "Almost all of the 148 hours that the City has identified . . . are services [that] were rendered for the purposes of dissuading the City from hostilely rezoning World Outreach's property to M-1 manufacturing and persuading the City to allow World Outreach to continue using the community center." (Dkt. 375 at 22–23.) But § 1988 does not provide for attorney's fees for rights that "do not arise under the Constitution or federal statutes." *Barrow* v. *Falck*, 977 F.2d 1100, 1104 (7th Cir. 1992). And "time spent before a state administrative body to secure . . . rights established by state law may not be charged against the defendant under § 1988, even though the defendants' acts violated the Constitution along with state law." *Id.* The time entries that fall into this category can be divided into three phases that roughly correspond with events in this litigation: (1) expenses incurred prior to the institution of this suit, (2) expenses incurred from that date until the SRO license was issued in August 2007, and (3) expenses incurred from that date going forward.

As to the first time period, the City has identified time spent by World Outreach navigating the City's administrative structure. If World Outreach unnecessarily incurred

attorney's fees in those proceedings as a result of a violation of the Constitution or federal law that falls under § 1988, then it was entitled to bring a claim for damages for those expenses, as was done with the attorney's fees incurred in the defense of the December 2005 lawsuit. Having accepted the City's offer of judgment, however, World Outreach is not entitled to additional damages, and certainly is not entitled to damages under the guise of a § 1988 fee petition. That is not to say that pre-suit investigation and drafting are not properly compensable under § 1988—they are—but the time entries identified by the City are not of that type. Such work accounts for 37.6 hours and will be excluded from the lodestar.

In the second period, World Outreach's attorneys spent considerable time preparing or appearing before the City's zoning department and working on identifiable inspection, plumbing, gas, or tax issues. This work was not done in pursuit of the claims that World Outreach raised in this lawsuit, and the 19.8 hours of time relating to these issues will not be included in the lodestar. Other work in this period related to the SRO license and was so intertwined with this litigation—as made clear by the ongoing discussions with the City's attorney and this court—that it cannot be fairly separated for the purpose of the lodestar analysis. Accordingly, the remainder of the time from this period will be included in the lodestar.

As to the third period, World Outreach's attorney's spent considerable time performing tasks unrelated to this litigation, including appearing before the City's administrative bodies, looking for social security numbers, and dealing with ongoing City inspections. This time accounts for an additional 45.4 hours that will be excluded from the lodestar.

Accordingly, a total of 102.8 hours will be excluded from the lodestar based on these objections.

## 2. December 2005 Lawsuit

The court previously determined that World Outreach was entitled to the attorney's fees it incurred defending against the City's December 2005 lawsuit. Following the court granting World Outreach summary judgment on that claim, the parties settled the associated damages. In its fee petition, World Outreach noted that it was "unclear" to it what time entries were associated with its defense of that lawsuit and, therefore, in lieu of removing any entries from its fee petition, it proposed reducing its request by the amount that the City had already paid World Outreach. In the alternative, World Outreach noted that if the City identified the time that World Outreach's attorneys spent on the December 2005 lawsuit, that it would remove them from its fee petition and not credit the City for the amount previously paid. The City undertook the analysis that World Outreach was apparently unable to perform and found 45.3 hours in World Outreach's fee petition relating to the defense of the December 2005 lawsuit. World Outreach does not take issue with any of the hours identified by the City; rather, in response it simply referred back to the credit it was giving to the City.

As discussed above, the attorney's fees incurred defending the December 2005 lawsuit are not § 1988 attorney's fees, but the damages incurred for the City's RLUIPA violation. In any event, since the City has identified the hours that related to this lawsuit, those 45.3 hours will be removed from the lodestar calculation, and there is no longer is any reason for World Outreach to credit the City for the damages previously paid.

## 3. Public Relations Work

The City identified 69.7 hours that World Outreach's attorneys spent on public relations. World Outreach does not object to the characterization of this time but, rather, cites to a case

from the Ninth Circuit in support of its argument that it is entitled to recover fees for such work. The law in this district is to the contrary, and World Outreach has not made a showing to justify such fees in this case. *See Reid* v. *Unilever U.S., Inc.*, No. 12 C 6058, 2015 WL 3653318, at *9 (N.D. Ill. June 10, 2015) (finding and citing other cases that determined media communications are not included in the lodestar); *see also Power of Praise*, 2011 WL 1157550, at *2 (declining to include attorney's fees for media publicity in the lodestar in a case involving World Outreach's counsel).

### 4.    ADF Grant

The City has identified 33.2 hours of work that World Outreach's attorneys spent relating to the ADF non-recourse grant, which secured some funding for this litigation. World Outreach without citation, argues that it is entitled to be paid for such time. At least one court in this district has found that such fees are not recoverable where plaintiffs have not made a showing that such intermediated funding was necessary to prevail. *See Dupuy* v. *McEwan*, 648 F. Supp. 2d 1007, 1023 (N.D. Ill. 2009) ("[T]he court agrees that time Plaintiffs spent arranging for other organizations to help pay the costs of the litigation is not compensable. Plaintiffs have not shown that they would have been unable to proceed in this case had they not made such solicitations, and the court is not satisfied that these efforts were necessary to achieve Plaintiffs' ultimate success in the courtroom. Furthermore, the court notes the irony in forcing Defendant to pay increased legal fees resulting from Plaintiffs' attempt to attain assistance in paying other legal fees for which Defendant is now responsible as well."). World Outreach has not made such a showing, so these hours will be excluded from the lodestar.

### 5. Work Incurred After the Offer of Judgment

In this case, the offer of judgment stated, "Defendant hereby offers to allow judgment to be taken against it by Plaintiffs in the amount of TWENTY FIVE THOUSAND AND ONE AND 0/100 DOLLARS ($25,001), plus reasonable costs and attorney's fees accrued as of the date of this offer, April 1, 2016, as determined by the Court." (Dkt. 353-1 ¶ 1.) Recently, the Seventh Circuit affirmed this court's interpretation of similar language, finding that the inclusion of such language cuts off fees under § 1988 except those incurred in responding to frivolous arguments. *See Morjal* v. *City of Chi.*, 774 F.3d 419, 422–23 (7th Cir. 2014). The arguments raised by the City before this court have not been frivolous and World Outreach has not demonstrated that the City has otherwise acted frivolously in their dealings. The City states that 126 hours incurred after the offer of judgment are included in the fee petition, and World Outreach has not contested that calculation. Accordingly, these hours will be excluded from the lodestar.

### 6. Unsuccessful Motions and Unnecessary Work

The City appears to have undertaken the task of detailing each of World Outreach's unsuccessful (or abandoned) motions over the course of this litigation and has labeled them unnecessary work. "[I]t is appropriate to deny fees for work on unsuccessful motions that did not otherwise advance the case and that was work that would not have been necessary if the party had pursued successful avenues." *Reid*, 2015 WL 3653318, at *14 (quoting *Jones* v. *Fleetwood Motor Homes*, 127 F. Supp. 2d 958, 973 (N.D. Ill. 2000)). Other than identifying the motions, however, the City has offered nothing by way of argument as to why the particular undertakings were unnecessary. Rather, it has simply identified the 356.9 hours spent on these motions, and

proposed that 75% of those hours be excluded from the lodestar. This case has spanned more

than a decade. Fee petitions are not intended to create mini-trials. The billing entries themselves

do not demonstrate why the work was unnecessary, and the court can fairly easily speculate as to

why the motions or other work may been necessary despite their lack of success or

abandonment.[10] The City may very well have persuasive arguments that counter this court's

speculation, but it did not make them in its response to the motion. Accordingly, the court will

include this work in the lodestar.

### C.    Excessive Billing

The City takes issue with 107.2 hours spent on clerical work, 21.3 hours on tasks for

which clients would not ordinarily be billed, 100.4 hours of excessive research, 85.6 hours of

vague entries, 70.4 hours of attorney time spent on paralegal tasks, and 76.58 hours of excessive

research and filings relating to attorney's fees. This amounts to 450.38, hours or about 9% of

5,010.6 hours initially sought. The court has spent considerable time reviewing these entries and

finds that while World Outreach did bill for costs that would not typically be billed to a client

---

[10] For example, this court denied a motion for sanctions brought by World Outreach. By the time the court ruled, however, World Outreach had already obtained part of the relief it sought and it very well may have been that such relief would not have been obtained without the motion. (*See* dkt. 159.) Additionally, the research done for the unfiled motion for partial summary judgment in 2006 was no doubt incorporated into World Outreach's subsequent summary judgment briefing. Even research that does not lead anywhere, such as is apparently the case for World Outreach's estoppel theory, is not by definition unnecessary. *See Corcoran* v. *City of Chi.*, 10 C 6825, 2015 WL 5445694, at *2 (N.D. Ill. Sept. 15, 2015) ("[A]s the Seventh Circuit has observed, '[t]hat the lawyers spent some time in blind alleys is irrelevant; this is inevitable, and the hourly rate reflects the fact that not all time is equally productive.' Brief research on a potential argument that the attorneys decided not to pursue on an issue where they ultimately prevailed need not be excluded." (alteration in original) (quoting *Kurowski* v. *Krajewski*, 848 F.2d 767, 776 (7th Cir. 1988)). Other things identified by the City, like World Outreach's trial brief, while not required, *see* Local Rule 16.1.4 n.3, are frequently components of litigation. (Here, World Outreach's work on its trial brief amounted to only 7.1 hours of attorney time, which is hardly excessive.) Even correcting deficiencies in its Seventh Circuit filing, which amounted to 6 hours of time, was work that needed to be done—even though it would have been better performed before the brief was filed.

(e.g., billing clients for clerical tasks such as delivering documents or entering time), the City too has overreached in its objections (*e.g.*, in what it considers clerical as opposed to paralegal or even attorney work and in its cursory argument that research was excessive). Nonetheless, in an exercise of billing judgment, World Outreach has offered an across-the-board reduction of 5% of its attorney time and 15% of its paralegal time, which would amount to approximately 250 hours of attorney time and 750 hours of paralegal time based on the number of hours initially sought. As such, World Outreach's across-the-board cut is a fair approximation of time that should fall into these categories.

Accordingly, the court will reduce the lodestar by 5% of attorney time and 15% of paralegal time after excluding any other hours that should be removed from the lodestar.

### D.    Summary of Exclusions and Modified Lodestar

The below tables summarizes the above reductions of the lodestar.

| Summary of Exclusions | | | | | | | |
|---|---|---|---|---|---|---|---|
| Attorney/ Paralegal | Unsuccessful Claims | Misc. Work | December 2005 Lawsuit | Public Relations | ADF Grant | Post-Offer of Judgment | Sum |
| J. Lee McCoy, Jr. | 37.7 | 41.9 | 0 | 6.1 | 22.3 | 0 | 108 |
| Andy Norman | 1.2 | 2.1 | 11.3 | 5 | 0.4 | 49.3 | 69.3 |
| John W. Mauck | 5.4 | 8.5 | 4.1 | 23.7 | 1.1 | 17 | 59.8 |
| Mikaela N. Hills | 0 | 0 | 0 | 6.4 | 0 | 51 | 57.4 |
| Other Paralegals | 46 | 3 | 0 | 2.1 | 0 | 0 | 51.1 |
| Elizabeth A. McGuan | 0 | 11.2 | 23.9 | 4.9 | 5.3 | 0 | 45.3 |
| Amy J. Parrish | 0 | 17.6 | 2.9 | 0 | 0 | 0 | 20.5 |
| Richard Baker | 0 | 17.2 | 3.1 | 0 | 0 | 0 | 20.3 |
| Communications | 0 | 0 | 0 | 17.6 | 0 | 0 | 17.6 |
| Noel W. Sterett | 0 | 0 | 0 | 3.9 | 4.1 | 8.7 | 16.7 |
| Cynthia L. Cunningham | 0 | 1.3 | 0 | 0 | 0 | 0 | 1.3 |
| TOTAL | 90.3 | 102.8 | 45.3 | 69.7 | 33.2 | 126 | 467.3 |

| Modified Lodestar | | | | | |
|---|---|---|---|---|---|
| Attorney/Paralegal | Claimed | Excluded | Rate | Sub Total | Total After 5%/15% Reduction |
| J. Lee McCoy, Jr. | 2130.3 | 108 | $300 | $606,690.00 | $576,355.50 |
| Andy Norman | 1091.6 | 69.3 | $550 | $562,265.00 | $534,151.75 |
| John W. Mauck | 378.7 | 59.8 | $600 | $191,340.00 | $181,773.00 |
| Mikaela N. Hills | 448.8 | 57.4 | $125 | $48,925.00 | $41,586.25 |
| Other Paralegals | 125.8 | 51.1 | $125 | $9,337.50 | $7,936.88 |
| Elizabeth A. McGuan | 129.9 | 45.3 | $125 | $10,575.00 | $8,988.75 |
| Amy J. Parrish | 47.6 | 20.5 | $300 | $8,130.00 | $7,723.50 |
| Richard Baker | 52.4 | 20.3 | $500 | $16,050.00 | $15,247.50 |
| Communications | 17.6 | 17.6 | $125 | $0.00 | $0.00 |
| Noel W. Sterett | 434.6 | 16.7 | $400 | $167,160.00 | $158,802.00 |
| Cynthia L. Cunningham | 89.6 | 1.3 | $125 | $11,037.50 | $9,381.88 |
| Richard S. Bell | 40.9 | 0 | $400 | $16,360.00 | $15,542.00 |
| Rene Aguilan | 22.8 | 0 | $125 | $2,850.00 | $2,422.50 |
| TOTAL | 5010.6 | 467.3 | N/A | $1,650,720.00 | $1,559,911.50 |

## III.    Adjustments to the Lodestar

After calculating the lodestar amount, the court must determine whether that amount should be adjusted upward or downward. *See Hensley,* 461 U.S. at 430 n. 3.[11] "When a plaintiff has obtained an excellent result, [her] attorney should recover a fully compensable fee (*i.e.,* the modified lodestar amount), and the fee 'should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit.'" *Spegon* v. *Catholic Bishop of Chi.,*175 F.3d

---

[11] The factors guiding this analysis include "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Hensley,* 461 U.S. at 430 n.3. "[T]he most critical factor is the degree of success obtained." *Id.* at 436.

544, 557 (7th Cir. 1999) (quoting *Hensley*, 461 U.S. at 435). When a plaintiff, however, only achieves a partial or limited success, the court has the discretion to reduce the lodestar amount to reflect an accurate degree of the plaintiff's success. *Id.* at 557–58. The degree of the plaintiff's success can be measured by the number of claims won and lost, but it can also be judged in light of the damages obtained compared to the resources expended to obtain them. *Montanez*, 755 F.3d at 556–57. "The trial judge is in a better position to assess whether the unsuccessful claims were important or trivial; whether a . . . judgment is a spectacular success, a dismal failure, or something in between; and whether the plaintiff's lawyers would have spent substantially less time on the case had they been more realistic." *Id.* at 557. Here, there was a dismal failure.

World Outreach's attorneys did not come close to achieving their lofty goals. At the outset of this litigation, World Outreach sought over $1.6 million in damages, which ballooned to $2.4 million before any claims had been resolved in World Outreach's favor. It is true that World Outreach reduced its damages calculation to approximately $336,000 (plus aggravation and inconvenience) just before trial. That is not an indication that World Outreach came closer to achieving its goals, but rather that its primary damages theory of missed opportunities with FEMA—which accounted for nearly 175 hours of World Outreach's attorneys' and paralegals' time (*see* dkt. 370-3 at 35)—was plainly not viable. Ultimately, World Outreach obtained $40,001 as a result of the $15,000 it obtained as damages on the City's December 2005 lawsuit and the $25,001 it obtained from the offer of judgment.

World Outreach maintains that there were other, non-monetary motivations for bringing the lawsuit and, therefore, it achieved "excellent results." According to World Outreach, the first

of these motivations was to defeat the City's December 2005 lawsuit that sought to limit World Outreach's use of its property. But the City voluntarily dismissed that lawsuit the week before World Outreach even filed this litigation. The second central purpose was to overcome the City's refusal to issue licenses to World Outreach. On January 31, 2007, the City signed off on World Outreach's license application for an SRO, and after necessary repairs were made the license issued on August 3, 2007. Even if the second central purpose was to have the City issue the needed licenses, the purpose was accomplished as of August 2007—and likely even by January 31, 2007. Therefore, while some peripheral issues may have arisen in the course of this litigation, for the last nine plus years this case has really been about damages, and as documented in the City's brief, the amount of damages requested over the history of this litigation overwhelms World Outreach's recovery.

There is no doubt that World Outreach had successes along the way, including those at the Seventh Circuit. And World Outreach argues that its attorneys contributed to the development of a significant RLUIPA precedent in *World Outreach II* by establishing the relevance of a religious organization's resources in the substantial burden analysis. *See Hyde*, 123 F.3d at 584 (discussing the relevance of establishing important precedent). It is true that courts, including those outside this circuit, have recited this language from *World Outreach II* in outlining RLUIPA principles. None, however, treats the resources issue as one of importance. *See e.g.*, *Academy of Our Lady of Peace* v. *City of San Diego*, No. 09 C 962, 2010 WL 1329014, at *11 (S.D. Cal. Apr. 1, 2010). So while it may be useful to RLUIPA plaintiffs in argument, it is not a holding in *World Outreach II* or any other case.[12]

---

[12] Dalton's assertion in his declaration about the importance of the case is of little relevance, since he provides no basis for his conclusion. (*See* dkt. 359-4 ¶ 7.)

23

World Outreach further argues that it advanced the public interest. There is no doubt that the suit exposed the City's RLUIPA violation as it pertained to the frivolous lawsuit, although such exposure would appear to be the case with any successful RLUIPA claim. *Cf. Power of Praise*, 2011 WL 1157550, at *2 ("Such an award is also reasonable . . . based on the public interest at stake in holding those accountable who violate the RLUIPA."); *see also Ragland* v. *Ortiz*, No. 08 C 6157, 2012 WL 4060310, at *7 (N.D. Ill. Sept. 14, 2012) ("For the public interest factor to weigh in plaintiff's favor, we look to whether there was some larger impact achieved by the verdict, such as exposing some deeper institutional problem within the department transcending the individual case." (quotation marks omitted)).

World Outreach also points out that its attorneys' efforts allowed for its ministry to benefit the Roseland community. Of course, the City maintains that any benefit to the Roseland community was achieved independent of this lawsuit. Certainly, World Outreach is a needed community resource in a poor area of the city. It is troubling, however, that by the fall of 2007 World Outreach had obtained its licensing for the SROs and was able to operate the community center insofar as it was able, but the litigation continued for years in pursuit of unrealistic damages. Whatever community benefit resulted may justify a lesser reduction than the 80% the City suggests. The amount of time expended by the parties, however, not to mention the judicial resources utilized as this case ping-ponged between this court and the Seventh Circuit, was enormous. Further, it was not until two weeks before trial was scheduled to begin, following this court's granting the City's emergency motions for discovery supporting Pastor Blossom's assertions, holding a final pretrial conference, and ruling on the bulk of the parties' voluminous motions *in limine*, that World Outreach accepted the City's offer of judgment for merely

$25,001.

World Outreach makes the striking assertion that its decision to accept the offer was not about a change in valuation, but rather World Outreach's desire not to see its attorney's hung out to dry. In other words, counsel feared total defeat, meaning they would receive nothing. World Outreach's fee request is more than 47 times its damages award, and even the modified lodestar remains more than 41 times the damages award. This again leaves the impression that the case has been about fees for a long time. *See Montanez*, 755 F.3d at 557 ("[A] fee request that dwarfs the damages award might raise a red flag." (quoting *Anderson* v. *AB Painting & Sandblasting Inc.*, 578 F.3d 542, 546 (7th Cir. 2009)).

In World Outreach's favor is the fact that this was a hard fought litigation that included World Outreach's prevailing twice at the Seventh Circuit on appeal, which entailed significant effort and delay. Further, there were non-monetary benefits to this litigation.

Ultimately, the court believes that an across the board reduction of 70% to $467,973.45 is warranted. This amount is still nearly 12 times the damages award. This reduction, however, recognizes that World Outreach's attorney's never had a realistic valuation of the case. It might have settled much earlier had counsel had been less concerned with recovering a large fee award. In the end, this case was not litigated like the $40,001 case it was, at best. Accordingly, a 70% reduction of the modified lodestar to $467,973.45 is warranted.

## IV.  Costs

As it does with attorney's fees, Local Rule 54.3 requires the parties to meet and confer to make a good faith effort to resolve costs issues and to address any remaining issues in a joint statement accompanying a motion for costs. From the parties' submissions and the City's

objections, it appears that a meet-and-confer never took place. While the parties submitted a joint statement, that statement did not address costs. Further, a number of the City's objections to the cost spreadsheet attached to the backend of World Outreach's time entries (*see* dkt. 359-5) are simply based on the vagueness of the entries. This suggests to the court that the parties made no effort to discuss these costs and, where necessary, provide the needed supporting documentation. As such, in accordance with Local Rule 54.3, the parties are directed to confer within the next 21 days to work to resolve any costs disputes. In doing so, the parties should pay careful attention to this court's recent rulings on bill of costs so as to aid in the resolution of disputes. *See Chi. Board Options Exchange, Inc.* v. *Int'l Secs. Exchange, LLC*, No. 07 C 623, 2014 WL 125937 (N.D. Ill. Jan. 14, 2014); *Clearlamp, LLC* v. *LKQ Corp.*, No. 12 C 2533, 2016 WL 7013478 (N.D. Ill. Nov. 30, 2016). If any disputes remain after a good faith effort has been made to resolve costs, the parties may submit a joint statement and motion relating to costs.

Date: February 14, 2017

U.S. District Judge Joan H. Lefkow